IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | 4:11CR3038 |
| | ) | |
| v. | ) | |
| | ) | |
| JOEL L. WITT, | ) | FINDINGS, RECOMMENDATION AND |
| | ) | ORDER |
| Defendant. | ) | |

This matter is before the court on the defendant's motion to suppress. Filing No. 22. For the reasons set forth below, the motion should be denied.

## FACTUAL BACKGROUND

On April 18, 2011 at approximately 10:15 a.m. (MST) Nebraska State Patrol Trooper Kevin Horst was notified by dispatch that the Pioneer Community Federal Credit Union (the "Bank" or the "Credit Union") in Palisade, Nebraska was robbed at gunpoint. Trooper Horst was in Ogallala, Nebraska at the time and responded to the call by making his way south and east toward Palisade. Trooper Horst was informed that the suspect was a white male, 5'8" - 5'10" tall, slender build, wearing a black stocking mask and a white hooded sweatshirt, and was driving a dark green or black station wagon with unknown license plates, and was carrying a black assault rifle ("AR") with a flashlight secured to the barrel with electrical tape. A second broadcast from dispatch indicated the car might have Colorado license plates. Trooper Horst was also informed that a black assault rife ("AR") with a flashlight secured to the barrel was used in the robbery. He was also informed that the witnesses at the Credit Union indicated that the suspect put the money in a dark grey or black bag.

Trooper Horst further testified that the traffic was "light" that morning and that he met approximately 6 vehicles while he was en route to Palisade. He received a call from Trooper

Jeffrey Crymble who indicated he had spotted a dark colored station wagon heading east on Highway 23 away from Palisade – about five miles from Trooper Horst's location. Trooper Crymble requested Trooper Horst's assistance in conducting an investigatory stop of the station wagon. Trooper Horst turned onto Highway 23 and passed a dark green station wagon with Nebraska license plates. Trooper Horst turned around, activated his emergency lights and initiated a stop of the station wagon at or around 11:00 a.m. (MST). Trooper Crymble joined Trooper Horst at the stop. Trooper Horst attempted to use his car's p.a. system to instruct the driver, later identified as the defendant, to exit the station wagon. The p.a. system malfunctioned and Trooper Horst then stood behind the open driver's side door of his patrol car, drew his firearm, instructed the defendant to turn off his vehicle, drop the keys on the ground, and step out of the station wagon with his hands in the air. The defendant was further instructed to raise his shirt above his waist line and turn around so the law enforcement officers could determine if he was carrying any weapons.

Seeing no firearms, the troopers holstered their weapons and approached the defendant. The troopers informed the defendant that there was a bank robbery and that the defendant's station wagon matched the description of the vehicle driven by the robbery suspect. Trooper Horst asked the defendant for identification. The defendant responded that he did not have any identification with him. Trooper Crymble asked if the defendant had any black rifles with him. The defendant responded that he had a black AR in the station wagon. The Troopers immediately ordered the defendant to put his hands behind his back. Trooper Horst drew his firearm to cover Trooper Crymble while Trooper Crymble put handcuffs on the defendant. The defendant was placed in the caged area of Trooper Horst's patrol car.

The troopers then approached the station wagon to ensure there were no other people in the car. They drew their weapons and ordered anyone else in the vehicle to come out with his hands in the air. When no one exited the station wagon, the troopers circled the vehicle

and looked through the windows to determine if anyone else was in the station wagon. Their inspection confirmed the station wagon did not contain any other individuals.

The defendant provided his name, date of birth, and his driver's license number to the troopers. Based on the information provided by the defendant, Trooper Horst contacted North Platte dispatch to verify his identity and run a check for warrants and criminal history. Dispatch informed Trooper Horst that the defendant did have a valid driver's license and had no prior arrests.

Troopers Horst and Crymble then attempted to take a picture of the defendant and his station wagon in order to transmit the pictures to the law enforcement official in charge of investigating the robbery. However, the troopers were apparently having difficulty with a proper internet connection and were unable to transmit the pictures. Trooper Crymble advised Trooper Horst to attempt to locate the weapon in the defendant's vehicle. Trooper Horst approached the station wagon and opened the passenger side door and saw some ".223" ammunition– the type used in AR-15s – in an open container which he removed from the car and placed on the ground. The back seat of the vehicle was "loaded with stuff" on top of which was a black AR-15. Trooper Horst testified that the weapon would have been easily accessible from the driver's seat. He could see the barrel of the gun while standing outside the right front passenger door of the vehicle. Trooper Horst removed the gun from the vehicle, cleared the chamber and removed the loaded magazine from the weapon. He noticed that the AR-15 had a black flashlight secured to the barred with electrical tape.

Trooper Horst went to the driver's side door and observed a black tool bag stacked right next to where the AR-15 was located. The bag was large enough to contain a weapon. Trooper Horst unzipped the bag and examined the contents. The bag contained stacks of money "banded" or "bundled" together.

The defendant was arrested and advised of his Miranda rights. The defendant was not questioned further at that time. He was transported to the Keith County detention center in Ogallala, Nebraska. The defendant was placed in a solitary cell, was given lunch and took a nap in his cell. Investigator Michael Dowling arrived, again read the defendant his Miranda rights, and interviewed Witt. The defendant made incriminating statements during the course of the interview.

LEGAL ANALYSIS

**The Investigatory Stop.**

The defendant asserts the law enforcement officers did not have reasonable suspicion or probable cause to conduct the initial investigatory stop of the defendant.

The legality of the stop is evaluated under the principles set forth in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968).

> It is well-established police may stop and briefly question a person if they have a reasonable, articulable suspicion of criminal activity. See Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). When justifying a particular stop, police officers "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. "The Fourth Amendment requires at least a minimal level of objective justification for making the stop." Illinois v. Wardlow, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (citing United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (emphasis supplied)).

United States v. Sawyer, 588 F.3d 548, 553-54 (8th Cir. 2009). "Whether reasonable suspicion exists depends on 'the totality of the circumstances, in light of the officer's

experience.' " United States v. Stigler, 574 F.3d 1008, 1010 (8th Cir. 2009)(quoting United States v. Banks, 553 F.3d 1101, 1104 (8th Cir. 2009)).

In this case, the law enforcement officers had the requisite reasonable suspicion to initiate a Terry stop of the defendant. The officers reported seeing a dark green station wagon – the exact type of vehicle used by the bank robber – driving on a highway away from Palisade, Nebraska – the place of the robbery. Trooper Horst testified it was significant that the station wagon's distance from Palisade corresponded with the time of the bank robbery. That is, the stop was initiated approximately one hour after the report of the bank robbery and approximately 60 miles from Palisade, Nebraska. The trooper also noted that the vehicle appeared to be driven by a single driver who was a white male. Again, noting that the report from dispatch indicated the robber was a lone white male.

The location of a vehicle and its description are two significant factors to be considered in Terry stops relating to vehicles. See United States v. Saffeels, 982 F.2d 1199, 1205-06 (8th Cir. 1992)(overruled on other grounds)(noting the officer's use of time and proximity to support a claim of reasonable suspicion to stop a car in which a suspected criminal was driving; the officer's observations were based on the posted speed limit and the suspect's distance from crime scene); see also, United States v. Hampton, 585 F.3d 1033, 1040 (7th Cir. 2009)(description and proximity of the vehicle to the reported crime are important factors to consider in accessing whether reasonable suspicion existed to justify a Terry stop).

The defendant suggests that the law enforcement officers should have ignored the green station wagon because the description was not very detailed and because the bank robber could have been in any number of places an hour after the robbery. These arguments are unpersuasive.

As an initial matter, the defendant suggests the officers needed probable cause to initiate the stop of Witt. This is incorrect. The trooper's were only required to possess reasonable suspicion to effectuate a Terry stop. See United States v. Bell, 480 F.3d 860, 863 (8th Cir. 2007)(internal citations omitted).

The defendant repeatedly asserts that the only reason the officers pulled Witt over is because he was driving a "dark station wagon." This assertion is also incorrect and does not provide the proper context for the officers' actions. The officers conducted a Terry stop because the description of the vehicle matched that of one believed to be involved in the robbery and was seen in a location that, based on time and distance, could not be eliminated as a possible escape route for the bank robber. See United States v. Juvenile TK, 134 F.3d 899, 903-04 (8th Cir. 1998) (supporting a finding of reasonable suspicion based on a description of a male in a gray car and the vehicle's "temporal proximity" to the reported criminal activity).

Moreover, the defendant's argument gives no consideration to the location of the robbery and subsequent Terry stop by the troopers. All of the activity occurred in rural southwestern Nebraska. This area of the state is sparsely populated and, in the words of Trooper Horst, "[t]here is not much out there." Trooper Horst testified that he saw a total of approximately six cars on the road after he received the information about the bank robbery from dispatch. He also testified that he did not see another dark colored station wagon on the road all morning. When considered in context, the troopers had at least the minimal level of objective justification required to justify the stop of a station wagon matching the description of a vehicle believed to be used in a bank robbery. See Orricer v. Erickson, 471 F.2d 1204, 1207 (8th Cir. 1973) (upholding a finding of reasonable suspicion where police officers stopped a vehicle in the vicinity of a robbery without any indication of wrongdoing on the

part of the driver because the robbery occurred in a small town early in the morning where little if any traffic could be expected).

It is true, that the bank robber could have been in a number of locations an hour after the Credit Union was robbed. This fact is not particularly relevant to the court's analysis. The question is whether it was objectively reasonable for the troopers to investigate the defendant based on the facts presented to them. Because the appearance of the station wagon outside of Grant, Nebraska met the description of the vehicle used in the crime and was traveling away from Palisade, and its temporal proximity to the crime location, the officers were reasonable in further investigating the vehicle and the defendant.

**The Search of the Station Wagon**.

Although the defendant does not argue so in his brief, at the evidentiary hearing the defendant suggested the search of the vehicle was improper.[1]

During a Terry stop, if an officer has "an objectively reasonable concern for officer safety or suspicion of danger" the officer may conduct a protective sweep of the vehicle's passenger compartment to "search for dangerous weapons that the suspect . . . might access

---

[1] The defendant did not expressly argue that the officer's conduct exceeded the scope of a permissible Terry stop, but defendant's counsel alluded to that argument during the hearing on this motion. Any assertion that the officer's conduct in drawing their weapons and requiring the defendant to exit the vehicle is unpersuasive. The officers were approaching a vehicle that matched the description of one used in a bank robbery conducted at gun point. They were aware the defendant may be armed with an assault rifle. Accordingly, the officers were entitled to take steps reasonably necessary to protect their personal safety, including having their firearms drawn. See United States v. Newell, 596 F.3d 876, 879-880 (8th Cir. 2011).

7

later." United States v. Smith, 645 F.3d 998, 1002 (8th Cir. 2011) (citing Michigan v. Long, 463 U.S. 1032, 1045-52 (1983)). This includes searching in items within the reach of the driver's seat that may contain weapons, such as bags. See United States v. Shranklen, 315 F.3d 959, 960-61 (8th Cir. 2003)(noting that a valid search for the purposes of officer safety extends to closed containers "that are found within the vehicle's passenger compartment"); United States v. Watts, 7 F.3d 122, 125 (8th Cir. 1993)(upholding the search of gun cases in a van for the purposes of officer safety); United States v. Peoples, 925 F.2d 1082 (8th Cir. 1991)(upholding the search of a bag in a van due to officer safety concerns).

In this case, the troopers had an objectively reasonable concern for their safety. They were investigating a bank robbery conducted with an assault rifle. Within minutes of the initial stop, the defendant admitted he had a black assault rifle in the station wagon. Thus, the officers were certain the vehicle contained at least one weapon. The troopers were entitled to conduct a protective sweep of the station wagon to locate the assault rifle and any other weapons the defendant might have in the car. The evidence reveals Trooper Horst began his search on the front passenger's side of the car where he quickly found an open container with ammunition for an assault rifle and saw the barrel of an AR-15 with a black flashlight taped to it. He testified the weapon would have been easily accessible from the drivers seat. He also discovered a black bag large enough to conceal a weapon within reach of the driver's seat. Upon opening the black bag the troopers discovered large amounts of bundled cash. At that point, the officers possessed probable cause to arrest the defendant. See United States v. Sherrill, 27 F.3d 344, 347 (8th Cir. 1994)("Probable cause to make a warrantless arrest exists when police officers have trustworthy information that would lead a prudent person to believe the suspect has committed a crime.")

The defendant argues that reasonable officers would not fear for their safety once the defendant was secured in the back of the squad car. This argument ignores a significant

amount of law holding that an officer may conduct a protective sweep of a car even after the suspect is secured. See Long, 463 U.S. at 1045-52 (1983); Smith, 645 F.3d at 1002; United States v. Plummer, 409 F.3d 906, 909 (8th Cir. 2005). As Trooper Horst testified, he was concerned that if Witt was released, he would have access to the AR, and any other weapons, in his car, creating a very real issue of officer safety.

Although Trooper Horst testified he did not open the black bag with concern it might contain a weapon, his subjective belief is of no import. In validating a protective sweep, the court must find only that a reasonable officer would have concern that the bag contained a weapon. See Plummer, 409 F.3d at 909 (applying an objective test in upholding the protective sweep of a vehicle); United States v. Rowland, 341 F.3d 774, 783 (8th Cir. 2003)(stating the lawfulness of a protective sweep of a car "does not depend upon the searching officer actually fearing a suspect is dangerous; rather such a search is valid if a hypothetical officer in the same circumstances could reasonably believe the suspect is dangerous); see also United States v. Banks, 553 F.3d 1101, 1105 (8th Cir. 2009)(noting the true test of whether a frisk of a suspect during a Terry stop is appropriate is whether "a reasonably prudent man" would believe that "his safety or that of others was in danger"). Having already found one weapon, a reasonably prudent officer would have been justified in searching the bag in this case. The troopers did not violate the defendant's Fourth Amendment rights when they searched the areas within reach of the driver's seat, including looking in the black bag, which was large enough to conceal a firearm or other weapon.

**Post-Arrest Questioning**.

The defendant further argues that the incriminating statements he made after his arrest should be suppressed because the admissions were made as a result of an unlawful arrest. That is, the defendant argues that because the initial stop was not supported by reasonable

9

suspicion, all subsequent actions taken by the law enforcement officials were improper. The government argues that even if the arrest was unlawful, sufficient factors were present to purge the taint.

The court has determined the initial stop and subsequent arrest were justified and lawful. Thus, defendant's argument regarding suppressing his subsequent statement is not relevant. However, even the court had ruled the initial stop was not supported by reasonable suspicion, the defendant's incriminating statements would not be suppressed.

Courts will examine four factors in determining whether statements made to law enforcement officers after an illegal arrest are admissible: (1) whether the suspect was read his or her Miranda rights prior to making incriminating statements; (2) the amount of time that passed between the arrest and the statements; (3) the occurrence of intervening factors between the arrest and the statements; and (4) the purpose or flagrancy of the conduct of the officers. Brown v. Illinois, 422 U.S. 590, 603-04 (1975); United States v. Barnum, 564 F.3d 964, 971 (8th Cir. 2009).

In this case, the factors weigh heavily in favor of admitting the statements even if the initial stop was not lawful. The defendant was read his Miranda rights twice – once when he was initially arrested on the roadside and again over an hour later when he was questioned by Investigator Dowling in Ogallala, Nebraska. During the passage of time, the defendant took a nap and ate a sandwich for lunch. He had time to contemplate his situation and determine if and how he would respond to questioning. He is an adult, speaks English, and was treated both professionally and compassionately by the questioning officer. He was not promised anything or threatened to secure his statements. The defendant's incriminating statements were knowing, intelligent, and voluntary. In short, even if the stop is deemed impermissible, the defendant's incriminating statements should not be suppressed.

IT THEREFORE HEREBY IS RECOMMENDED to the Honorable Warren K. Urbom, United States District Judge, pursuant to 28 U.S.C.§636(b)(1)(B), that the defendant's motion to suppress, (filing no. 22), be denied in all respects.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

IT IS ORDERED:

1) The trial of this case is set to commence before the Honorable Warren K. Urbom at 9:00 a.m. on November 14, 2011, or as soon thereafter as the case may be called, for a duration of four (4) trial days, in Courtroom 4, United States Courthouse, Lincoln, Nebraska. Jury selection will be held at commencement of trial.

2) A conference with counsel for the parties will be held before Judge Urbom in his chambers beginning at 8:30 a.m. on November 14, 2011.

DATED this 28th day of September, 2011.

BY THE COURT:

*s/ Cheryl R. Zwart*
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.