IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | 4:11CR3038 |
| --- | --- | --- |
| Plaintiff, | ) | |
| | ) | MEMORANDUM AND ORDER ON THE |
| v. | ) | DEFENDANT'S OBJECTION TO THE |
| | ) | MAGISTRATE JUDGE'S FINDINGS, |
| JOEL L. WITT, | ) | RECOMMENDATION AND ORDER |
| | ) | |
| Defendant. | ) | |

Defendant Joel L. Witt moved to suppress evidence obtained by law enforcement officers who stopped his vehicle, arrested him, and interrogated him on April 18, 2011. (ECF No. 22.) United States Magistrate Judge Cheryl R. Zwart presided over a hearing of this motion on July 8, 2011, and July 27, 2011, (ECF Nos. 30, 39), and in accordance with 28 U.S.C. § 636(b)(1)(B)-(C) and Federal Rule of Criminal Procedure 59(b)(1), the magistrate judge has recommended that I deny the defendant's motion, (see ECF No. 53). Now before me is the defendant's "Objection to Magistrate's Recommendation." (ECF No. 54.) In the course of my de novo review of those portions of the magistrate judge's findings and recommendation that the defendant challenges, see 28 U.S.C. 636(b)(1); Fed. R. Crim. P. 59(b)(3), I have studied the magistrate judge's Findings, Recommendation and Order, (ECF No. 53), the motion, objection, and briefs submitted by the parties, (ECF Nos. 22, 24, 27, 38, 50, 51, 54, 55, 56), the transcript of the hearing before the magistrate judge, (ECF No. 46), and the exhibits received during the hearing, (see ECF No. 41). After reviewing these materials, I find that the magistrate judge's recommendation should be adopted. The defendant's objection will be overruled, and his motion to suppress will be denied.

**I. BACKGROUND**

The defendant submits that the magistrate judge's memorandum includes "errors of fact." (Def.'s Br. at 2, ECF No. 55.) I find, however, that on the whole, the magistrate judge has set forth the relevant facts clearly and accurately, (see Findings, Recommendation & Order at 1-4, ECF No.

53), and I shall adopt the magistrate judge's factual findings with only slight modifications. A brief summary of the relevant facts follows.

At approximately 10 a.m. Mountain Time on April 18, 2011, Nebraska State Patrol Trooper Kevin Horst was in Ogallala, Nebraska, when he received a radio transmission stating that a bank robbery had occurred in the town of Palisade, Nebraska. The suspect was described initially as a male, armed with a rifle, who was driving a dark green or black station wagon. The rifle was believed to be an AR15 or M-16 with a flashlight attached to its barrel, and the station wagon was believed to have Colorado license plates. Trooper Horst was directed to drive south on Highway 61 to look for the suspect vehicle. After a short time, and after seeing few vehicles on the road, Trooper Horst received a transmission stating that Trooper Jeffrey Crymble spotted a green station wagon heading west on Highway 23.[1] Trooper Horst moved to intercept the station wagon, and he stopped it approximately two miles east of Grant, Nebraska. The stop occurred approximately fifty or sixty miles away from Palisade, Nebraska, and approximately one hour after the robbery. Trooper Horst testified during the hearing that "the station wagon, dark green one, was the only station wagon that I had seen all morning."

Trooper Horst and Trooper Crymble stopped their vehicles about thirty feet behind the station wagon. Trooper Horst directed the driver to turn off his engine, drop his keys out of the station wagon, and exit his vehicle with his hands raised. Both troopers stood behind the open doors of their vehicles with their weapons drawn as Trooper Horst shouted his instructions to the driver. After the driver complied with Trooper Horst's instructions, Trooper Horst ordered the driver to approach the troopers, lift his shirt, and "spin around" so the troopers could check his waistline for weapons. (Tr. at 19, ECF No. 46.) The driver complied and, seeing no weapons in the driver's waistband, the troopers holstered their weapons and approached the driver on foot. One of the troopers then informed the driver that there had been a bank robbery and that the driver's vehicle "matched the description." (Id. at 21.) It should be noted, however, that although the driver's vehicle was a dark green station wagon, it did not have Colorado license plates. The trooper asked the driver for his

---

[1] The magistrate judge's report states that the station wagon was headed east on Highway 23. (Findings & Recommendation at 2, ECF No. 53.) Trooper Horst testified, however, that the station wagon was traveling west. (Tr. at 12-14, 47, ECF No. 46.)

2

license, and the driver responded that he did not have it with him.  At this point, one of the troopers seems to state, "We're just going to look at your car, do you mind?  You don't have any rifles, or black guns, or anything in that car?"  (In-car camera video at 5:45, Pl.'s Ex. 2.)  The driver responded that he had an "AR" in the back.  Trooper Horst then drew his weapon while Trooper Crymble cuffed the driver's hands behind him.  Trooper Horst placed the driver in the "caged area" of his patrol vehicle, helped Trooper Crymble determine that no one remained in the station wagon, and then returned to his vehicle to attempt to verify the driver's identity.  The driver identified himself as Joel L. Witt (the defendant), and Trooper Horst learned via dispatch that the defendant's driver's license was valid and that he had no prior arrests.

      To determine whether the defendant was the suspect they sought, the troopers took photos of the defendant and his station wagon, and they attempted to transmit these photos to an officer who was investigating the robbery.  They then decided to try to locate the weapon that the defendant claimed was stowed in the back of the station wagon.  Trooper Horst opened the passenger door of the station wagon, and in the front seat he found ammunition that could be used in an AR15 assault rifle.  In the back seat, stacked among other objects, Trooper Horst spotted the barrel of an AR15.  The AR15 had a small flashlight fixed to the barrel with electrical tape, and it was in a location where it could be reached by the driver of the station wagon.  Trooper Horst removed the AR15 from the vehicle, cleared it of rounds, disengaged the magazine, and took it to Trooper Crymble.

      Sometime during the stop, an investigator called Trooper Crymble and reported that the suspect used a black or dark gray bag during the robbery.  (Tr. at 34, ECF No. 46.)  Trooper Horst returned to the vehicle to look for more weapons and for the bag.  He found a black tool bag, approximately 12 inches by 8 inches in size, next to the spot where the assault weapon had been.  Trooper Horst unzipped the bag until it was more than halfway open and discovered that it contained money.  Some of this money was bundled together by paper bands.  Trooper Horst brought the bag to Trooper Crymble, returned to his own vehicle, placed the defendant under arrest, and "advised him of his rights."  (<u>Id.</u> at 37.)  He then transported the defendant to the Keith County jail in Ogallala, which was approximately a twenty-five minute drive from the site of the stop.  Trooper Horst did not speak to the defendant during the drive.

When the defendant arrived at the Keith County jail, the jail staff placed him in a solitary cell and served him lunch. The defendant then took a nap. Approximately one hour after his arrival at the jail, the defendant was interviewed by Investigator Michael Dowling of the Nebraska State Patrol. At the outset of the interview, Investigator Dowling read an Advisement of Rights form to the defendant. The defendant indicated on the form that he understood his rights and that he wished to proceed with the interview. During the interview, the defendant made a number of oral and written statements indicating that he was responsible for the bank robbery. He also signed a Permission to Search form to allow law enforcement officers to search his vehicle without obtaining a warrant.

The defendant filed a motion to suppress the "evidence obtained by [the] Nebraska State Patrol or other law enforcement officers during the traffic stop of the defendant, during the search of his vehicle, and during his interrogation, both at the time of his roadside arrest and during his formal interview." (Def.'s Mot. at 1, ECF No. 22.) In support of his motion, the defendant argued that the law enforcement officers did not have reasonable suspicion or probable cause to stop his vehicle, adding that "[b]ecause the initial stop and search were unlawful, any evidence flowing from them must be suppressed as well." (Def.'s Br. at 2, ECF No. 24.) He also argued that the officers lacked authority to search his vehicle and that his statements were taken in violation of his Fifth Amendment rights. (Def.'s Mot. at 2.) In response, the government argued that the initial stop was supported by a reasonable suspicion of criminal activity; that the officers's suspicions justified a sweep of the interior of the vehicle for weapons; that the defendant's arrest was lawful; and that even if the defendant's arrest was not lawful, the statements made by the defendant at the Keith County jail are admissible because they were "sufficiently an act of free will to purge the primary taint." (Pl.'s Br. at 13, ECF No. 27 (quoting United States v. Ramos, 42 F.3d 1160, 1164 (8th Cir. 1994), abrogation on other grounds by United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007)).)

The magistrate judge found that "the law enforcement officers had the requisite reasonable suspicion to initiate a Terry stop of the defendant." (Findings, Recommendation & Order at 5, ECF No. 53.) She also found that the officers' search for the assault rifle and for the black bag was part of a lawful protective sweep of the vehicle's passenger compartment. In support of this finding, she

4

noted that Trooper Horst's own lack of concern that the bag might contain a weapon was not relevant because a "reasonable officer would have concern that the bag contained a weapon." (Id. at 9.) Finally, the magistrate judge concluded that even if the defendant's arrest was unlawful, the incriminating statements should not be suppressed. (Id. at 10 (citing Brown v. Illinois, 422 U.S. 590, 603-04 (1975); United States v. Barnum, 564 F.3d 964, 971 (8th Cir. 2009)).)

On October 9, 2011, the defendant filed an objection to the magistrate judge's Findings, Recommendation, and Order. (ECF No. 54.) My analysis of his objection follows.

## II. ANALYSIS
### A. The Initial Stop

The defendant argues first that the magistrate judge erred by finding that the defendant's "roadside stop" was supported by a reasonable suspicion of criminal activity. (Def.'s Br. in Supp. of Objection at 3, ECF No. 55.)

"A Terry investigatory stop allows an officer briefly to detain a citizen if the officer has a reasonable suspicion that 'criminal activity may be afoot.'" United States v. Ortiz-Monroy, 332 F.3d 525, 528 (8th Cir. 2003) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). See also United States v. Bustos-Torres, 396 F.3d 935, 942 (8th Cir. 2005) ("Law enforcement officers may make an investigatory stop if they have a reasonable and articulable suspicion of criminal activity."). "A reasonable suspicion is a 'particularized and objective' basis for suspecting the person who is stopped." Bustos-Torres, 396 F.3d at 942 (quoting United States v. Thomas, 249 F.3d 725, 729 (8th Cir. 2001)). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." Id. (quoting United States v. Halls, 40 F.3d 275, 276 (8th Cir. 1994)). The detention may last while the officer makes "'reasonable inquiries' aimed at confirming or dispelling his suspicions." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (citing Terry, 392 U.S. at 30). "In forming a basis for suspicion, officers may 'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" Ortiz-Monroy, 335 F.3d at 529 (quoting United States v. Arvizu, 534 U.S. 266, 273 (2002)).

5

In this case, the troopers were instructed to search a particular area of the state for a dark green or black station wagon with Colorado plates driven by a male armed with an AR15 or M-16 assault weapon. Trooper Crymble spotted the defendant's dark green station wagon traveling in the targeted area, and I find that under the totality of the circumstances, it was reasonable for Trooper Horst and Trooper Crymble to stop the defendant's vehicle to investigate whether the defendant had been involved in the robbery. Although the defendant's vehicle did not match perfectly the description of the vehicle involved in the robbery, it did match the color and type of the suspect vehicle, and Trooper Horst saw no other similar vehicles during the morning of April 18, 2011. Also, the direction of travel of the defendant's vehicle and its distance from the site of the robbery supported the officer's decision to stop the defendant.

Although I am not aware of a case that stands squarely on all fours with the instant one, I agree with the magistrate judge's conclusion that the initial stop of the defendant's vehicle did not offend the Fourth Amendment. (See Findings, Recommendation & Order at 4-6, ECF No. 53 (citing, inter alia, United States v. Juvenile TK, 134 F.3d 899, 903-04 (8th Cir. 1998) (indicating that an analysis of "the temporal and geographic proximity of the car to the scene of the crime, the matching description of the vehicle, and the time of the stop" supported the court's conclusion that reasonable suspicion existed)).) See also United States v. Molina, 226 F. App'x 523, 527-28 (6th Cir. 2007) (holding car's color, make, and location created "a particularized basis giving rise to reasonable suspicion" even though black colored Nissan vehicles are common); United States v. Hurst, 228 F.3d 751, 755-57 (6th Cir. 2000) (holding that stop of the defendant's dark blue Mercury Cougar located 25 minutes' driving time from the scene of the crime was supported by reasonable suspicion even though the suspect vehicle was described as a dark-colored Thunderbird, and even though the defendant's vehicle contained a different number of occupants than the suspect vehicle). Cf. United States v. Jaquez, 421 F.3d 338, 341 (5th Cir. 2005) (holding that stop was not supported by a reasonable suspicion when officer knew only that "a red vehicle" had been involved in an incident 15 minutes earlier in the same general area where the stop occurred).

The defendant argues that because "the direction of the vehicle departing the robbery was unknown" and because that vehicle "could have gone as far as 90 miles any direction from the bank" during the time between the robbery and the stop, it was simply not reasonable for the troopers to

6

stop the defendant's vehicle. The defendant adds that the relevant area includes 25,000 square miles and "undoubtedly [includes] hundreds of dark station wagon[s]," and he argues that it is not reasonable to "single out a vehicle in this enormous area simply because it's a dark wagon." (Def.'s Br. in Supp. of Objection at 3, ECF No. 55.) I disagree. First, there is no evidence that the relevant area included "hundreds of dark station wagons." On the contrary, the record suggests that no other similar vehicles were observed in the area patrolled by Trooper Horst during the relevant time.[2] It is true that the suspect vehicle departed from the bank in an unknown direction and that the defendant's vehicle was not stopped in the vicinity of the bank. These factors do bear upon the reasonableness of the troopers' decision to make the stop. I find, however, that given the totality of the circumstances, the "temporal and geographic gaps" between the robbery and the stop "were not enough to dispel the reasonable suspicion" given the similarities between the defendant's vehicle and the suspect vehicle, the scarcity of the relevant type of vehicle, and the direction of travel of the defendant's vehicle. United States v. Tilmon, 19 F.3d 1221, 1225 (7th Cir. 1994). It also bears repeating that the "temporal and geographic gaps" between the robbery and the stop do not weigh against the troopers' actions in this case; the defendant's vehicle was stopped in an area that had been targeted for investigation by law enforcement, and there is no dispute that the suspect could have reached the location where the defendant was stopped during the allotted time.

The defendant also disputes the notion that his vehicle was traveling away from the scene of the robbery at the time of the stop. (Def.'s Br. in Supp. of Objection at 4, ECF No. 55.) He states that the map in evidence shows that the stop was "separated from Palisade" by "30 miles or so of Highway 6, . . . about 20 miles of Highway 61[,] and some smaller number on Highway 23." (Id.) He argues, "It can be as easily said he was heading back toward Palisade as away from it," and it is not "as though [the car] were heading out of [Palisade] on the nearest highway available" when it was stopped. (Id.) I have studied the map in evidence and the hearing testimony, and although the

---

[2] I note in passing that the defendant appears to have defined the size of the "relevant area" by calculating the area of a circle with a 90-mile radius. (Def.'s Br. in Supp. of Objection at 3, ECF No. 55.) This area appears to encompass land lacking roads, towns, or other surfaces where a station wagon is likely to travel. (See Map of Nebraska, Pl.'s Ex. 7. See also Tr. at 12, ECF No. 46 ("There is not much out there.").) In other words, the defendant has likely overestimated the relevant area by a considerable margin.

7

route described by the defendant does appear to circle back toward Palisade, there is no evidence that the defendant was traveling on this route when he was stopped. On the contrary, Trooper Horst testified that he (Horst) was traveling east on Highway 23 away from Grant, Nebraska, when he passed the defendant's vehicle head-on. In other words, the defendant was not traveling east toward Palisade, Nebraska, at the time of the stop. It is true that the defendant was not stopped on a road leading directly out of Palisade, Nebraska. Nevertheless, I find that the location of the stop and the defendant's direction of travel at the time of the stop provide support for the troopers' decision to investigate whether the defendant was involved in the robbery.

Next, the defendant argues that "it is misleading to suggest that any distance within [the relevant] area 'corresponds' to the time of the crime more than any other" because "the trooper acknowledged that any vehicle within [the] 90 mile radius was '[e]qually suspect.'" (Def.'s Br. in Supp. of Objection at 4, ECF No. 55.)[3] He adds, "[T]he robber could have hidden the vehicle in a garage down the street from the bank just as likely as he could have covered 90 miles of highway." (Id.) I agree with the defendant that, given Trooper Horst's testimony, the troopers likely would have sought to investigate any dark green or black station wagon within a plausible radius of the bank. I do not see how this avails the defendant, however. The possibility that other dark green or black station wagons could have been in the relevant area (though none were seen) does not dispel the reasonable suspicion justifying the troopers' decision to stop the defendant.

The defendant also argues that the magistrate judge improperly found that the defendant's vehicle "matched" the suspect vehicle. He states, "[T]here can be no exact match of a vague description. The car had not been described by year, make, or model. It had not been described by a specific color and it was a mismatch to the one thing that might have been specific: Colorado plates." (Def.'s Br. in Supp. of Objection at 4, ECF No. 55.) It is true that the suspect vehicle was believed to have Colorado license plates, and the defendant's vehicle did not match this part of the description. Discrepancies such as these do not necessarily dispel all reasonable suspicion, however. See, e.g., United States v. Albus-Price, 518 F.3d 926, 930-31 (D.C. Cir. 2008) (explaining that

---

[3] More precisely, Trooper Horst agreed that "other dark wagon type vehicle[s] within an hour's drive of the bank [in] any direction could have been equally suspect." (Tr. at 49, ECF No. 46.)

8

"[r]easonable suspicion can survive in the face of discrepancies between the vehicle described and the vehicle stopped") (citing, inter alia, United States v. Hurst, 228 F.3d 751, 756-57 (6th Cir. 2000)). Given the totality of the circumstances, I am persuaded that the troopers' decision to stop the defendant was supported by a reasonable suspicion that he had been involved in the robbery.[4]

## B. The Troopers' Discovery of the Assault Rifle

The defendant argues next that because the troopers "confronted the un-Mirandized defendant with the fact that [the troopers] would be searching his vehicle for a gun, the defendant's predictable statement of what the officer would find and the rifle he then did find should not be admitted." (Def.'s Br. in Supp. of Objection at 4, ECF No. 55.) As I noted previously, a detention supported by reasonable suspicion may continue while law enforcement officers make "'reasonable inquiries' aimed at confirming or dispelling [their] suspicions." Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (citing Terry, 392 U.S. at 30). Under the circumstances presented here, it was reasonable for the troopers to ask the defendant for permission to search the vehicle for a rifle, and it was reasonable for them to ask whether the defendant was, in fact, carrying such a weapon in his station wagon. The defendant's admission that he had an "AR" in his vehicle will not be

---

[4] Trooper Horst discussed the implications of the license plate discrepancy during the hearing before the magistrate judge:

Q. Did the fact that the [defendant's] vehicle bore Nebraska plates rather than Colorado plates play a role or play a factor in whether or not to stop the vehicle?

A. No, not really.

Q. Why not?

A. License plates are usually the most unreliable form of information given by - - this is from my experience only. They are very unreliable from my witnesses. However, the station wagon, dark green one, was the only station wagon that I had seen all morning actually.

(Tr. at 69, ECF No. 46.)

suppressed.⁵  Furthermore, I agree with the magistrate judge's conclusion that the defendant's admission gave rise to "an objectively reasonable concern for officer safety" that permitted the troopers to "conduct a protective sweep of the vehicle's passenger compartment to 'search for dangerous weapons that the suspect . . . might access later.'" (Findings, Recommendation & Order at 7-8, ECF No. 53 (quoting United States v. Smith, 645 F.3d 998, 1002 (8th Cir. 2011)).) See also Michigan v. Long, 463 U.S. 1032, 1049 (1983)  In short, it was permissible for the officers to search the defendant's station wagon for the "AR" described by the defendant.

### C. The Search for the Black Bag

The defendant also argues that it was unlawful for Trooper Horst to search the station wagon for the back bag because "officer safety was not a real concern and . . . he was, in fact, gathering evidence." (Def.'s Br. in Supp. of Objection at 4, ECF No. 55.)  I am not persuaded.  As I noted above, the circumstances facing the troopers gave rise to an objectively reasonable concern for officer safety, and this safety concern justified a protective sweep for weapons that might be located in the passenger compartment of the station wagon.  It was permissible for this sweep to include closed containers that might hold weapons, e.g., United States v. Shranklen, 315 F.3d 959, 963 (8th Cir. 2003), and Trooper Horst's testimony indicates that the bag was large enough to hold a weapon. Moreover, the Eighth Circuit has stated clearly that the searching officer's subjective motivation during a protective sweep is irrelevant; the question, rather, is whether "a hypothetical officer in the same circumstances could reasonably believe the suspect is dangerous." United States v. Plummer, 409 F.3d 906, 909 (8th Cir. 2005) (quoting United States v. Rowland, 341 F.3d 774, 783 (8th Cir. 2003)).  In this case, a hypothetical officer in Trooper Horst's position could have reasonably believed "that there may have been additional weapons in the car over which [the defendant] could have gained immediate control . . . if he were permitted to re-enter his car." Id. Under these circumstances, it was lawful for Trooper Horst to unzip the defendant's black bag and look inside.

---

⁵ I note in passing that the defendant has not argued that he was "in custody" at the time of his admission, such that Miranda warnings were required at this stage of the encounter. See, e.g., United States v. Muhlenbruch, 634 F.3d 987, 995 (8th Cir. 2011) ("Under the Fifth Amendment, Miranda warnings are required when 'interrogation is initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" (Citation omitted)).

## D. Whether the Defendant's Post-arrest Statements Were Sufficiently an Act of Free Will to Purge the Taint of an Unlawful Arrest

Finally, the defendant states in passing that "[t]he depth of taint" in this case "is uncorrectable." (Def.'s Br. in Supp. of Objection at 4, ECF No. 55.) I take this to be an objection to the magistrate judge's conclusion that, even if the initial stop of the defendant was not supported by a reasonable suspicion, the defendant's post-arrest statements should not be suppressed. (See Findings, Recommendation & Order at 9-10, ECF No. 53.) The defendant's post-arrest statements can only be excluded, however, if some illegality "is at least a but-for cause of obtaining the [statements]." United States v. Reisselman, 646 F.3d 1072, 1079 (8th Cir. 2011) (quoting United States v. Olivera-Mendez, 484 F.3d 505, 511 (8th Cir. 2007)). Although "the ultimate burden of persuasion to show the [statements are] untainted [by illegality] lies with the government," the defendant must first "come[] forward with specific evidence demonstrating taint." Id. In this case, the defendant has failed to show that the statements obtained by the troopers were tainted by any illegality. Under these circumstances, there is no need for the government to show that the statements were not obtained "by exploitation of [an] illegality [but] instead by means sufficiently distinguishable to be purged of the primary taint." Id. (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)).

Nevertheless, I have conducted a de novo review of the magistrate judge's analysis of this question, and I find that even if the initial stop were unlawful, the defendant's statements at the jail were sufficiently voluntary to purge the taint. "In order to determine whether statements provided are voluntary to purge the taint of the illegal[ity] . . . [the court] must consider the giving of Miranda warnings, the 'temporal proximity' of the [illegality] and the statements made, the 'presence of intervening circumstances,' and 'the purpose and flagrancy of the official misconduct.'" Reisselman, 646 F.3d at 1080 (quoting United States v. Lakoskey, 462 F.3d 965, 975 (8th Cir. 2006)). As the magistrate judge noted,

> The defendant was read his Miranda rights twice[:] once when he was initially arrested on the roadside and again over an hour later when he was questioned by Investigator Dowling in Ogallala, Nebraska. During the passage of time, the defendant took a nap and ate a sandwich for lunch. He had time to contemplate his situation and determine if and how he would respond to questioning. He is an adult, speaks English, and was treated both professionally and compassionately by the

11

questioning officer. He was not promised anything or threatened to secure his statements. The defendant's incriminating statements were knowing, intelligent, and voluntary. In short, even if the stop is deemed impermissible, the defendant's incriminating statements should not be suppressed.

(See Findings, Recommendation & Order at 10, ECF No. 53.) The magistrate judge's analysis is correct, and I adopt it in full.

**IT IS ORDERED** that:

1. the defendant's objection to the magistrate judge's findings, recommendation and order, ECF No. 54, is overruled;

2. the magistrate judge's recommendation, ECF No. 53, is adopted; and

3. the defendant's motion to suppress, ECF No. 22, is denied.

Dated October 26, 2011.

BY THE COURT

s/ Warren K. Urbom
United States Senior District Judge